1  ISMAIL J. RAMSEY (CABN 189820)
   United States Attorney

2

3  KATHERINE L. WAWRZYNIAK (CABN 252751)
   Chief, Criminal Division

4  NICHOLAS M. PARKER (CABN 297860)
   Assistant United States Attorney

5

6       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495

7       Telephone: (415) 436-7368
        Fax: (415) 436-7234

8       Nicholas.Parker3@usdoj.gov

   Attorneys for United States of America

9

10                    UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                     SAN FRANCISCO DIVISION

13  UNITED STATES OF AMERICA,              )    CASE NO. 3:23-MJ-70807 MAG
                                           )
14           Plaintiff,                    )    MEMORANDUM IN SUPPORT OF UNITED
                                           )    STATES' MOTION FOR DETENTION
15       v.                                )
                                           )    Hearing Date:    June 7, 2023
16  YOBANI AMINADAB GALLARDO               )    Hearing Time:    10:30 a.m.
    CASTRO,                                )    Courtroom:       14 (18th Floor)
17       a/k/a "YUCA NOCHE"                )    Judge            Hon. Sallie Kim
         a/k/a "SINALOA,"                  )
18                                         )
             Defendant.                    )
19  _____)

20              I.        **INTRODUCTION**

21       On June 1, 2023, officers from the Drug Enforcement Administration and Daly City Police

22  Department arrested the defendant, Yobani Aminadab GALLARDO CASTRO as part of a coordinated

23  operation involving multiple subjects suspected of trafficking narcotics throughout the San Francisco

24  Bay Area. The defendant presently is charged with one count of possession with intent to distribute

25  cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), in connection with his possession of

26  approximately 140 grams of cocaine at the time of his arrest. *See* Dkt. 1. But that charge belies the

27  seriousness of the defendant's role as a suspected supplier of narcotics to street-level drug dealers

28  operating in the Tenderloin district of San Francisco.

UNITED STATES' DETENTION MEMORANDUM      1
3:23-MJ-70807 MAG

The defendant is a citizen of Mexico with few connections to the Bay Area. He is a professional drug dealer who has been deported or removed from the United States at least three times: in August 2015 (twice) and in December 2016. The defendant has no verifiable employment and his own girlfriend—the woman with whom he lives and his only known connection to the Bay Area—has refused to be a surety on his behalf. *See* Dkt. 8 at 2. Indeed, the only putative surety is the defendant's sister-in-law, who lives in another state and who apparently communicates with the defendant as infrequently as four times per year. With little reason to stick around to see this case through, the defendant has an incentive to flee. To assure the defendant's appearance in court and the safety of the community, the government respectfully requests that the Court order the defendant detained pending trial.

## II.   FACTUAL BACKGROUND

### A.   "YUCA NOCHE" Is Identified as a Supplier of Drugs to Tenderloin Dealers

In July 2022, Drug Enforcement Administration (DEA) agents investigating fentanyl traffickers in the Tenderloin identified a man using the phone number (510) 491-6101, who they knew only as "YUCA NOCHE," as a supplier of fentanyl to street-level drug dealers. Subsequent investigation revealed that, immediately before or after selling drugs to an undercover DEA agent on two occasions in January and February 2023, a man named Darwin AVILA-DIAZ—who was later arrested with the defendant and who is charged in Case No. 3:23-mj-70804—called "YUCA NOCHE" at (510) 491-6101. DEA agents investigating AVILA-DIAZ and "YUCA NOCHE" eventually learned that, between April 14, 2023, and May 5, 2023, there were 66 phone calls between AVILA-DIAZ and "YUCA NOCHE."

### B.   Investigation Reveals "YUCA NOCHE's" Communications with Tenderloin Dealer

On May 11, 2023, the Hon. Edward J. Davila issued an order authorizing the interception of wire and electronic communications to and from AVILA-DIAZ's cell phone. *See* Case No. 23-CR-90895 MISC EJD. Those wire intercepts included 10 calls between AVILA-DIAZ (415-879-0253) and the man agents knew at the time as "YUCA NOCHE" (510-491-6101) during the period May 12, 2023, to June 1, 2023. Most, if not all, of those calls concerned narcotics and narcotics trafficking in the Bay Area.

#### 1.   May 12, 2023

For example, on May 12, 2023, AVILA-DIAZ called "YUCA NOCHE." Their conversation occurred in Spanish and lasted for more than four minutes. A preliminary and partial summary of the

call, which was translated to English by a DEA-employed linguist, is as follows:

*YUCA NOCHE said the dude (fourth party) said there was no "perico" (parrot/possibly cocaine) over there, in Mexico. AVILA-DIAZ asked for clarification. YUCA NOCHE said they (fourth party and others) had not brought down "perico" to Mexico. AVILA-DIAZ said that dude (third party) got it ("perico") yesterday night. AVILA-DIAZ said he (third party) told him (AVILA-DIAZ) there was some now. YUCA NOCHE said yes, but that it "perico" (parrot/possibly cocaine) was not here (USA). YUCA NOCHE said there was none in Mexico and said they (YUCA NOCHE and others) would need to order it, since there was none. AVILA-DIAZ said oh. YUCA NOCHE said it ("perico") was barely going to come down from up there, from Colombia. AVILA-DIAZ said oh. YUCA NOCHE said they (customers) had also asked if there was any ("perico") inside here (USA). YUCA NOCHE said there was some ("perico") but were asking for more (higher price). AVILA-DIAZ said they (AVILA-DIAZ) would see what happened and told YUCA NOCHE to let him (AVILA-DIAZ) know, so that (AVILA-DIAZ) could work. YUCA NOCHE said alright. AVILA-DIAZ said he (AVILA-DIAZ) wanted to get people (customer), get a phone. YUCA NOCHE said he (YUCA NOCHE) was going to tell AVILA-DIAZ that later on he (AVILA-DIAZ) could buy his (AVILA-DIAZ) own "perico" (parrot/possibly cocaine). AVILA-DIAZ said that was what he (AVILA-DIAZ) was going to do. AVILA-DIAZ said all those dudes (possibly brokers) worked that way. AVILA-DIAZ said they (possibly brokers) sold it, once finished they (possibly brokers) would get more and pay whatever they (possibly brokers) had and so on. YUCA NOCHE said yeah. AVILA-DIAZ said that dude (third party) sold to the guys that he (AVILA-DIAZ) sold to, over on 9th (Street). YUCA NOCHE said yeah. AVILA-DIAZ said however, since he (AVILA-DIAZ) got along with the guys (customers), the dude (fourth party/customer) would from him (AVILA-DIAZ). Parties said their goodbyes.*

    2.   May 15, 2023

On May 15, 2023, AVILA-DIAZ called "YUCA NOCHE." Their conversation occurred in Spanish and lasted for almost 19 minutes. A preliminary and partial summary of the call, which was translated to English by a DEA-employed linguist, is as follows:

*YUCA NOCHE asked what was up. AVILA-DIAZ asked if YUCA NOCHE had cooked (possibly narcotics) already. YUCA NOCHE said no. AVILA-DIAZ asked why. YUCA NOCHE said because he (YUCA NOCHE) did not have any (possibly narcotics). AVILA-DIAZ told YUCA NOCHE the dude (third party, possibly other source) was left without any product (possibly narcotics). YUCA NOCHE asked for clarification, AVILA-DIAZ repeated that the dude (third party) was left with no product (possibly narcotics). YUCA NOCHE said he (YUCA NOCHE) was waiting and said they (fourth parties) were going to bring him (YUCA NOCHE) 3 kilos (possibly narcotics) and that dude (third party) only bought 1 kilo. AVILA-DIAZ said yes, because that dude (third party) [U/I] 2 [U/I] (possibly trips). AVILA-DIAZ told YUCA NOCHE he (AVILA-DIAZ) had 3 (possibly orders for) whole ones for tomorrow. YUCA NOCHE said cool. AVILADIAZ said that if YUCA NOCHE got on it, he (YUCA NOCHE) would sell that shit (possibly narcotics) quickly with him (AVILA-DIAZ). AVILA-DIAZ said that was if YUCA NOCHE wanted to. YUCA NOCHE said he (YUCA NOCHE) did not have anything (possibly narcotics) and that was why he (YUCA NOCHE) had not said anything to AVILA-DIAZ.*

UNITED STATES' DETENTION MEMORANDUM    3
3:23-MJ-70807 MAG

*YUCA NOCHE said he (YUCA NOCHE) wanted AVILA-DIAZ to gather money and he (YUCA NOCHE) would give AVILA-DIAZ 1/2 a kilo (possibly narcotics). YUCA NOCHE asked if AVILA-DIAZ understood, AVILA-DIAZ said yes. YUCA NOCHE asked why AVILA-DIAZ was going to pass him (YUCA NOCHE) the deals (customers), if AVILA-DIAZ needed to get money as well. AVILA-DIAZ said yeah. YUCA NOCHE said AVILA-DIAZ needed to get on it though and said he (YUCA NOCHE) had told AVILA-DIAZ to get his (AVILA-DIAZ) act together many times
and AVILA-DIAZ did not care.*

*YUCA NOCHE said he (YUCA NOCHE) sold 2 kilos in 2 weeks. AVILA-DIAZ said that was good. YUCA NOCHE said 2 kilos, but he (YUCA NOCHE) was not making much (profit) there. YUCA NOCHE said he (YUCA NOCHE) was just doing that dude (possibly YUCA NOCHE's source) a favor. AVILA-DIAZ said yeah. YUCA NOCHE said on this one (possibly new order) he (YUCA NOCHE) was on track (possibly going to make a profit). YUCA NOCHE said he (YUCA NOCHE) had not sold a little and said they (YUCA NOCHE and others) got out (sold) 2 kilos in 2 weeks. AVILA-DIAZ said it (possibly narcotics) got sold. YUCA NOCHE said a kid got 1/2 a kilo and said he (YUCA NOCHE) sold him (kid) 1/4 one week and another 1/4 the next week and so on.*

*YUCA NOCHE said the "perico" (parrot, possibly narcotics) that he (YUCA NOCHE) had, he (YUCA NOCHE) was going to give it (perico, possibly narcotics) to AVILA-DIAZ at 18. AVILA-DIAZ said that was good (price). YUCA NOCHE said 18 (possibly 18,000) bucks and said that was what he (YUCA NOCHE) sold it (perico, possibly narcotics) for. AVILA-DIAZ asked if YUCA NOCHE gave it (perico, possibly narcotics) at that price on the block. YUCA NOCHE said no, he (YUCA NOCHE) would sell the 1/4 for 5,000, at 20 bucks. AVILA-DIAZ said that was good. YUCA NOCHE said he (YUCA NOCHE) gave the kilo at 20,000 bucks and 5,000 for the 1/4. AVILA-DIAZ said that was good. AVILA-DIAZ said okay and asked YUCA NOCHE to let him (AVILA-DIAZ) know. YUCA NOCHE said yes, and said his (YUCA NOCHE) buddy had called down there (Mexico) already and there was some (possibly narcotics) now. YUCA NOCHE said he (YUCA NOCHE's buddy) called 4 four days ago, but there was none (possibly narcotics). YUCA NOCHE said they (possibly narcotics) had not come down from that side (possibly Colombia per previous calls). YUCA NOCHE said they (possibly narcotics) had arrived now and they (possibly YUCA NOCHE's buddy's source and others) had picked them (possibly narcotics) up already. YUCA NOCHE said they (YUCA NOCHE and AVILA-DIAZ) had to wait for them (possibly YUCA NOCHE's buddy's source and others) to send it (possibly narcotics) over here (USA) now.*

### 3.   June 1, 2023

On June 1, 2023, agents intercepted several calls between AVILA-DIAZ and "YUCA NOCHE." In the first, which lasted for approximately four minutes, AVILA-DIAZ called "YUCA NOCHE." Their conversation occurred in Spanish; a preliminary and partial summary of the call, which was translated to English by a DEA-employed linguist, is as follows:

*YUCA NOCHE said he (YUCA NOCHE) would call him (AVILA-DIAZ) back. AVILA-DIAZ told YUCA NOCHE that yesterday he (AVILA-DIAZ) had weighted that stuff*

1
2
3
4
5
6
7
8
9
10
11
12

*(narcotics) and all of the product (possibly narcotics) was not there. AVILA-DIAZ said the amount YUCA NOCHE had said was not all there. YUCA NOCHE said it was there. YUCA NOCHE told AVILA-DIAZ he (YUCA NOCHE) had weighed it (narcotics). AVILA-DIAZ said the envelopes YUCA NOCHE had brought, he (AVILA-DIAZ) had weighted 3 of the 50 ones and the 9 that he (AVILA-DIAZ) took separately. AVILADIAZ told YUCA NOCHE that it was not all there. YUCA NOCHE said he (YUCA NOCHE) weighed it (possibly narcotics) and it was 168 (possibly grams or ounces). AVILA-DIAZ said he (AVILA-DIAZ) did not think so and said he (AVILA-DIAZ) weighted 3 at 50 and the 9 he (AVILA-DIAZ) took, for a total of 159. YUCA NOCHE said minus the bag. AVILA-DIAZ told YUCA NOCHE that with the bag it weighed 51. AVILA-DIAZ said he (AVILADIAZ) was going to tell YUCA NOCHE yesterday. AVILA-DIAZ told YUCA NOCHE that he (AVILA-DIAZ) always did that whenever he (AVILA-DIAZ) had product (possibly narcotics). AVILA-DIAZ said he (AVILA-DIAZ) always weighed it (possibly narcotics) and took pictures of it (possibly narcotics). YUCA NOCHE said he (YUCA NOCHE) did not know. AVILA-DIAZ said he (AVILA-DIAZ) told the woman (possibly AVILA's girl) that he (AVILA-DIAZ) was not distrusting but to tell him (YUCA NOCHE) that next time [U/I]. YUCA NOCHE said he (YUCA NOCHE) told AVILA-DIAZ because he (YUCA NOCHE) did not know if that shit (possibly narcotics) had, if it (possibly narcotics) went down that much (possibly after cutting). YUCA NOCHE said that was why he (YUCA NOCHE) was scared because it was an ounce and a half.*

13
14
15
16

In subsequent calls on June 1, 2023, "YUCA NOCHE" told AVILA-DIAZ he would come to AVILA-DIAZ's house to "make more rock" and instructed AVILA-DIAZ to "start warming up the water." Their conversations occurred in Spanish, and preliminary and partial summaries of those conversations, which were translated to English by a DEA-employed linguist, are as follows:

17
18
19
20
21
22
23
24
25
26
27
28

*AVILA-DIAZ said he (AVILA-DIAZ) was waiting for YUCA NOCHE (to come) early. YUCA NOCHE said yes and asked what AVILA-DIAZ was going to do right now. AVILA-DIAZ said nothing, and said he (AVILA-DIAZ) was in the car. YUCA NOCHE said he (YUCA NOCHE) was going to come over to AVILA-DIAZ's house to make more "rock" (narcotics). AVILA-DIAZ asked if YUCA NOCHE was going to be with him (AVILA-DIAZ). YUCA NOCHE said yes. AVILA-DIAZ said alright. YUCA NOCHE said [U/I] what happened. AVILA-DIAZ said YUCA NOCHE had probably finished it (possibly narcotics) already. YUCA NOCHE said yes. AVILA-DIAZ said YUCA NOCHE was doing well. YUCA NOCHE said no, he (YUCA NOCHE) was barely going to start (working), because he (YUCA NOCHE) was getting some clients. AVILA-DIAZ said when YUCA NOCHE [U/I] needed to mix them (possibly narcotics). YUCA NOCHE said yes, that was what he (YUCA NOCHE) wanted, for them (possibly narcotics) to get mixed. YUCA NOCHE told AVILA-DIAZ that when he (YUCA NOCHE) left, he (YUCA NOCHE) was going to leave him (AVILA-DIAZ) his (YUCA NOCHE) phone. AVILA-DIAZ told YUCA NOCHE he (YUCA NOCHE) had failed him (AVILA-DIAZ) last time. YUCA NOCHE told AVILA-DIAZ that he (YUCA NOCHE) had not left yet. AVILA-DIAZ said with the "negra" (black, possibly heroin).*

*. . .*

UNITED STATES' DETENTION MEMORANDUM   5
3:23-MJ-70807 MAG

*AVILA-DIAZ asked if YUCA NOCHE was on the way. YUCA NOCHE said he (YUCA NOCHE) was about to get on the road. AVILA-DIAZ told YUCA NOCHE to bring the baking soda because he (AVILA-DIAZ) did not have any (baking soda). YUCA NOCHE asked where he (YUCA NOCHE) could buy that (baking soda). AVILA-DIAZ said at the store, and said it (baking soda) was sold at any store. YUCA NOCHE said okay and asked how many. AVILA-DIAZ said he (AVILA-DIAZ) did not know how many YUCA NOCHE was going to make. YUCA NOCHE asked if 10 or 20. AVILA-DIAZ said he (AVILA-DIAZ) did not know how many YUCA NOCHE was going to make. YUCA NOCHE said he (YUCA NOCHE) did not know, but enough for AVILA-DIAZ to have some (possibly narcotics) there. AVILA-DIAZ told YUCA NOCHE to bring 10 then. YUCA NOCHE asked if 10. AVILA-DIAZ said yes. YUCA NOCHE said alright and said he (YUCA NOCHE) would be on the way shortly.*

*. . .*

*AVILA-DIAZ asked if YUCA NOCHE was still at home. YUCA NOCHE said he (YUCA NOCHE) was just about to leave to go buy the baking soda. YUCA NOCHE asked if 10 of baking soda. AVILA-DIAZ said yes. YUCA NOCHE told AVILA-DIAZ to start warming up the water. AVILA-DIAZ said he (AVILA-DIAZ) was going to turn it off since he (AVILA-DIAZ) had thought he (YUCA NOCHE) was already on the way. YUCA NOCHE asked if when the "perico" (possibly powder cocaine) was very clean, it would increase (weight). AVILA-DIAZ said when one would add a cut to it (possibly narcotics), yes. YUCA NOCHE asked if AVILA-DIAZ had a cut. AVILA-DIAZ said no. YUCA NOCHE asked what type of cut it was. AVILA-DIAZ said he (AVILA-DIAZ) did not know. AVILA-DIAZ said he (YUCA NOCHE) had explained to him (AVILA-DIAZ) but he (AVILA-DIAZ) had never cut the powder. YUCA NOCHE asked AVILA-DIAZ if he (YUCA NOCHE) remember how AVILA-DIAZ used to buy it (possibly narcotics) from Umber [PH]. YUCA NOCHE said it (possibly narcotics) was made like that one. AVILA-DIAZ said yes. AVILA-DIAZ told YUCA NOCHE it (possibly weight of narcotics) would not go down instead it (weight) would go up. YUCA NOCHE said the dude (Umber) must have cut it then. AVILA-DIAZ said it (possibly weight of narcotics) would go up 1 or 2. AVILA-DIAZ said if it weighed 50, it (possibly narcotics) would go up to 52, 53. YUCA NOCHE said yes. AVILA-DIAZ said he (AVILA-DIAZ) was talking to the woman last night about it. AVILA-DIAZ said she (woman) was saying that there was "powder" that would go down because it was probably sold fully cut. YUCA NOCHE said yes that when you work with it, it comes with cuts. AVILADIAZ said he (possibly Umber) had always told him (AVILA-DIAZ), that when he (AVILA-DIAZ) would go buy (some) to try to do something and if it (possibly narcotics) did not [U/I] and went down (weight), then to ask them (third party) to exchange it. YUCA NOCHE said to have them (third party) fix it (possibly narcotics) then. [Background- UF said car shows.] AVILA-DIAZ said he (AVILA-DIAZ) was going to show YUCA NOCHE a "powder" that was "carchoso" [PH] (possibly crumbled). YUCA NOCHE asked if the one from Umber. AVILA-DIAZ said yes. YUCA NOCHE said okay then. YUCA NOCHE said he (YUCA NOCHE) was going to [U/I] had the baking soda and would head out there (AVILA-DIAZ's) shortly.*

### C.   "YUCA NOCHE" Travels to Southern California

On May 24, 2023, GPS ping location data from (510) 491-6101, which law enforcement officers obtained pursuant to a warrant signed by the Hon. Laurel Beeler in Case No. 3:23-mj-70691 LB, indicated that the user of the device assigned that phone number (*i.e.*, "YUCA NOCHE") traveled by car from San Francisco to Santa Ana, California, and that he remained there for approximately 24 hours before returning by car to the Tenderloin district of San Francisco, where GPS location data from his phone suggests the user of that phone number resides.

### D.   "YUCA NOCHE" Is Identified as GALLARDO-CASTRO

On June 1, 2023, at approximately 12:05 p.m., agents intercepted a call between AVILA-DIAZ and "YUCA NOCHE," in which "YUCA NOCHE" said he would meet AVILA-DIAZ at AVILA-DIAZ's residence in Daly City, California—where "YUCA NOCHE" said he and AVILA-DIAZ would "make more rock," which DEA agents believe to mean prepare narcotics for sale.[1] Agents subsequently used GPS location data to track (510) 491-6101, the phone number used by "YUCA NOCHE," to AVILA-DIAZ's house in Daly City and observed two Hispanic men enter the house at approximately 2:44 p.m. Agents then observed two Hispanic men depart the house at approximately 3:55 p.m. and drive away. Daly City police officers pulled over the car the two men were traveling in at approximately 3:58 p.m. after seeing that the car's registration was expired and that there was no front license plate on the car, each of which is a violation of California law.

There were two men inside the car—AVILA-DIAZ, who was driving, and a then-unknown man who did not have any identification on him in the front passenger seat. The officers determined that AVILA-DIAZ was on probation and asked him if they could search the car. When AVILA-DIAZ consented to the search, officers found what they suspected to be cocaine in the front center console. The officers then detained the two men and searched them and the rest of the car. The officers found, among other things, approximately 140 grams of what they suspected to be cocaine in a bag in the then-unknown man's possession.

---

[1] A more complete (but still partial) summary of this call appears in Part II.B.3, *infra*.

An officer also called (510) 491-6101—the number used by "YUCA NOCHE"—and saw a flip phone in the then-unknown man's possession ring, confirming the then-unknown man was "YUCA NOCHE."

When officers asked "YUCA NOCHE" for his identification, he told them he did not have it on him but that his wife had a photo of his ID that she could send to the officers. "YUCA NOCHE" provided his wife's phone number, which is a number associated with a woman agents identified as Y.B. Officers called Y.B., who told the officers she would text them a photograph of "YUCA NOCHE's" ID. Shortly thereafter, Y.B. sent a photograph of "YUCA NOCHE's" identification—a Mexican voter ID card bearing a photograph of a man who resembled the person then in custody and identifying him as Yobani Aminadab GALLARDO CASTRO.

### III.    LEGAL STANDARD

Under the Bail Reform Act of 1984, the Court must detain a defendant before trial without bail where "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person in the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk; the government need not prove that both factors are present. *See United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that a defendant is a danger to the community must be supported by clear and convincing evidence, but a finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *See id.*

"[T]he Bail Reform Act mandates an individualized evaluation guided by the factors articulated in [18 U.S.C.] § 3142(g)." *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Categorical grants or denials of bail, not tethered to an individualized determination, are impermissible. *See id.* Consideration of factors outside the articulated factors set forth in Section 3142 is also disfavored. *See id.*

Where (as here) there is probable cause that a defendant has violated the Controlled Substances Act and faces a maximum of 10 years in prison or more, courts apply a rebuttable presumption against the defendant that no condition or combination of conditions reasonably will assure the defendant's appearance as required and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A). Under this

scheme, the burden of production then shifts to the defendant. *See United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008). Although the presumption is rebuttable, it is not a "bursting bubble." *United States v. Jessup*, 757 F.2d 378, 382-83 (1st Cir. 1985) (Breyer, J.), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990). In other words, the presumption is not so weak that if a defendant introduces evidence, "the presumption 'bursts' and totally disappears, allowing the judge (or jury) to decide the question without reference to the presumption." *Id.* (further stating that such an approach would "render the presumption virtually meaningless" because a defendant can "always provide the magistrate with *some* reason" (emphasis added)). Even if the defendant rebuts the presumption, the presumption is not erased; instead, it remains in the case as an evidentiary finding militating against release that is to be weighted along with other relevant factors. *See United States v. King*, 849 F.2d 485 (11th Cir. 1988); *accord United States v. Ward*, 63 F. Supp. 2d 1203, 1209 (C.D. Cal. 1999) (citing *Jessup*, 757 F.2d at 389).

If the court concludes that the defendant has rebutted the statutory presumption of detention, the court must consider four factors in determining whether the pretrial detention standard is met. Those factors are: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (iv) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

## IV.   ARGUMENT

### A.   Mr. Gallardo Castro Is Subject to a Rebuttable Presumption in Favor of Detention

The Complaint on file in this case charges the defendant with a single violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), which carries a statutory maximum penalty of 20 years in prison.[2] As such,

---

[2] Notwithstanding the single charge in the Complaint, the government submits there is probable cause to believe the defendant (together with AVILA-DIAZ) committed at least one more serious offense—that is, a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and/or 21 U.S.C. § 846.

1   the defendant is subject to a rebuttable presumption in favor of detention. *See* 18 U.S.C. § 3142(e)(3)(A).

2   To overcome this presumption, the defendant must show that he is not a flight risk *and* that his release

3   will not endanger the community. He cannot do so.

4         **B.**     **The Defendant Presents a Significant Flight Risk**

5         The defendant was born in, and is a citizen of, Mexico. He has a Mexican identification card.

6   Most of his family (including his parents and, perhaps, his children[3]) reside in Mexico. The defendant

7   himself appears to have lived predominantly in Mexico until last year. The government's current

8   understanding is that he is in the United States unlawfully and, indeed, he has been deported or removed

9   from this country at least three times: (i) on December 31, 2016, after having been arrested in Nogales,

10  Arizona, in November 2016; (ii) on August 26, 2015, after having been arrested in Calexico, California,

11  the day prior; and (iii) on August 29, 2015—that is, just three days after having been deported on a prior

12  occasion—after having been arrested in El Centro, California, earlier that same day. *See* Dkt. 8 at 1-4.

13        The defendant has no verifiable job in the Bay Area (other than being a drug dealer). Although

14  he claims to work construction for "various companies," Dkt. 8 at 1-2, he has provided no details about

15  any such work and the government is not aware of any. The defendant lives with his girlfriend, but she

16  has declined to be a surety for him. *See* Dkt. 8 at 2-3. In fact, the only person who has volunteered to be

17  a surety is the defendant's sister-in-law, who lives hundreds of miles away and who is married to a man

18  (the defendant's brother), with whom the defendant admits he has only "infrequent contact." Dkt. 8 at 1.

19  With that in mind, the putative surety, who says she communicates with the defendant "[o]nce every

20  three months," presumably cares little whether the defendant sticks around the Bay Area to attend his

21  court dates in this case. Ultimately, the defendant—who has the means to flee, as evidenced by his

22  sojourn to Southern California less than two weeks ago—has few incentives to see this case to its

23  conclusion, and there is no reason to think he will appear for these proceedings if the Court releases him.

24        In consideration of all the circumstances—including the nature and circumstances of this offense,

25  the weight of the evidence against him and his scant connections to the Bay Area—there is a substantial

26  risk that the defendant will refuse to abide by any court-ordered conditions of release and flee.

27

28       [3] Confusingly, the defendant's girlfriend contradicted the defendant's statement that he has no children; rather, she claims he has two minor children who reside in Mexico. *See* Dkt. 8 at 3.

UNITED STATES' DETENTION MEMORANDUM    10
3:23-MJ-70807 MAG

C.      **The Defendant Is a Danger to the Community**

As evidenced by the wire intercepts summarized above, the defendant is actively trafficking narcotics in this judicial district, including—agents believe—by transporting large quantities of narcotics from Mexico and/or Southern California to the Bay Area. The defendant's "continuing involvement with the distribution of drugs" militates in favor of detention. *United States v. Wolf*, 2015 WL 4573039, at *3 (N.D. Cal. July 29, 2015); *United States v. Fulgham*, 2012 WL 2792439, at *4 (N.D. Cal. July 9, 2012) ("The Senate Report states: The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the safety of any other person or the community. Defendant's tendency to repeatedly commit similar crimes shows that he poses an unmitigable danger to the community." (quotation marks and citation omitted)).

The defendant's dangerous drug trafficking activities establish that the only way to safeguard the community from the defendant is to detain him pending trial.

V.      **CONCLUSION**

There are no set of conditions that will reasonably assure the appearance of the defendant at court proceedings or ensure the safety of the community. The Court should order the defendant detained pending trial.

DATED:  June 7, 2023                                  Respectfully submitted,

                                                     ISMAIL J. RAMSEY
                                                     United States Attorney


                                                      */s/ Nicholas M. Parker*
                                                     NICHOLAS M. PARKER
                                                     Assistant United States Attorney

UNITED STATES' DETENTION MEMORANDUM     11
3:23-MJ-70807 MAG